THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA EX REL.,
SUZANNE NIEHAUS,

                PLAINTIFF,                          CASE NO.: 2:21-cv-10243-SJM-CI

vs.                                          Honorable Stephen J. Murphy, III

DAVITA, INC., COMMERCE TOWNSHIP       **FILED UNDER SEAL**
DIALYSIS CENTER, LLC and WEST
BLOOMFIELD DIALYSIS, LLC,

                DEFENDANTS.

_____/

McKelvie, McKelvie, Yee & Epacs, P.C.
By:  Charles L. McKelvie  (P27782)
     Edmund S. Yee  (P63007)
Attorneys for Plaintiff
280 West Maple Road, Suite 220
Birmingham, Michigan  48009
(248) 952-5100

_____/

## COMPLAINT

      **NOW COMES** Plaintiff/Relator in the above-styled action, by and through her counsel

of record and states that this is an action brought on behalf of the United States of America by

SUZANNE NIEHAUS ("Relator") against the above-named Defendants pursuant to the *Qui*

*Tam* provisions of the Civil False Claims Act, 31 U.S.C. §§3729-33.

## JURISDICTION AND VENUE

      1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1345 and 31

U.S.C. §3732(a) and §3730.

2.      Venue is appropriate as to each Defendant, in that one or more of the Defendants can be found in, reside in, and/or transacts business in this judicial district.  Additionally, acts proscribed by 31 U.S.C. §3729 have been committed by one or more of the Defendants in this judicial district.  Therefore, within the meaning of 28 U.S.C. §1391(c) and 31 U.S.C. §3732(a), venue is proper.  Relator has made voluntary disclosures to the United States Government prior to the filing of this lawsuit as required by 31 U.S.C. §3730(b)(2).  This Court has jurisdiction to entertain a *Qui Tam* action.  Relator is an "original source" and brings this action in the name of the United States as contemplated by the False Claims Act ("FCA"), 31 U.S.C. §§3729-33.

## THE PARTIES

3.      Relator, Suzanne Niehaus, is a citizen of the United States of America.  She is a resident of Oakland County, Michigan.  Relator brings this *Qui Tam* action based upon direct and unique information obtained during the period of her employment as a Registered Nurse of one (1) of the dialysis clinics owned and operated by Defendants, DaVita, Inc. and Commerce Township Dialysis Center, LLC ("CTDC") in Commerce Township, Michigan.

4.      Defendant DaVita, Inc. (hereinafter "DaVita") is a for-profit Delaware corporation, with headquarters in Denver, Colorado.  DaVita provides dialysis services for patients diagnosed with chronic kidney failure.  DaVita has over 1,300 outpatient dialysis facilities and acute clinics in over 800 hospitals.  Its clinics are located in 42 states, including the State of Michigan and the District of Columbia.  DaVita is the largest independent provider of dialysis services in the United States.  This Defendant is subject to the jurisdiction of this Court.

5.      Defendant CTDC is a for-profit Delaware corporation, located in Commerce Township, Michigan.  CTDC provides dialysis services for patients diagnosed with chronic kidney failure.  This Defendant is subject to the jurisdiction of this Court.

2

6.      Defendant West Bloomfield Dialysis, LLC ("WBD") is a for-profit Delaware corporation, located in West Bloomfield, Michigan.  WBD provides dialysis services for patients diagnosed with chronic kidney failure.  This Defendant is subject to the jurisdiction of this Court.

## GOVERNMENT HEALTH PROGRAMS
## BACKGROUND INFORMATION

7.      The Medicare Program (hereinafter "Medicare") is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue.  It is overseen by the United States Health and Human Services Department.  Medicare was designed to assist participating states in providing medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify for Medicare.

8.      The Medicaid Program (hereinafter "Medicaid") is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue.  It is overseen by the United States Health and Human Services Department.  Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially-needy individuals that qualify for Medicaid.

9.      The Civilian Health and Medical Program of the Uniformed Services (hereinafter "CHAMPUS") is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty days or longer.  The program is administered by the Department of Defense and funded by the federal Government.

10.     The Civilian Health and Medical Program of the Veterans Administration (hereinafter "CHAMPVA") provides similar benefits for spouses and children of veterans who are entitled to VA permanent and total disability benefits and to widows and children of veterans

3

who died of service-related disabilities. The program is administered by the Department of Defense and funded by the federal Government.

## **FALSE CLAIMS ACT CAUSES OF ACTION**

11. The False Claims Act ("FCA"), 31 U.S.C. §3729(a)(1) makes knowingly presenting or causing to be presented, to the United States Government or a member of the Armed Forces of the United States, any false or fraudulent claim for payment or approval a violation of Federal Law punishable by three (3) times the amount of the actual damages the Government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

12. The FCA, 31 U.S.C. §3729(a)(2) makes knowingly making or using or causing to be used a false record or statement to get a false or fraudulent claim paid or approved by the Government a violation of federal law punishable by three (3) times the amount of the actual damages the Government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

13. The FCA, 31 U.S.C. §3729(a)(3) makes it unlawful to conspire to defraud the Government by getting a false or fraudulent claim allowed or paid.

14. In this case, Defendants have, with knowledge of, or in reckless disregard of, or in deliberate ignorance of the truth of the falsity of the information involved, made, used, caused to be made or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of *inter alia* 31 U.S.C. §3729(a)(1) and (a)(2).

15. Further, Defendants conspired to violate the FCA and to defraud the Government. Therefore, 31 U.S.C. §3729(a)(3) is applicable to this action as well.

## FALSE CLAIMS ACT DEFINITIONS

16.     The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

17.     For purposes of the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

18.     The fraudulent billing practices and action of the Defendants described hereafter relate to acts of Defendants which caused submission to the Government of false and fraudulent claims by clinics, medical providers and medical facilities for otherwise reimbursable charges relating to dialysis drugs and overcharging for saline solution and charging for Heparin that was not actually administered.

19.     The purpose of the false or fraudulent schemes described in the following paragraphs hereafter was to obtain reimbursement by the Government and other private insurers. Because of the actions of the Defendants, these medical providers have submitted false and fraudulent claims for reimbursement through the unlawful and fraudulent conduct hereafter described in express violation of federal and state statutes, rules and regulations.

**FACTUAL SUMMARY OF DEFENDANTS' UNLAWFUL CONDUCT**

20.     Relator was a registered nurse who worked for DaVita at its dialysis clinic, CTDC, located in Commerce Township, Michigan between September 2013 and January 2018.

21.     Relator ran the clinic with the assistance of three (3) technicians.

22.     Relator reported to Georgia Farr ("Farr"), the Facility Administrator ("FA") of the Commerce dialysis clinic.

23.     In or about December 2017, Relator noticed that syringes that had been prepared to administer Heparin to dialysis patients per doctors' orders had not been filled with Heparin.

24.     Heparin is an anticoagulant (blood thinner) that prevents the formation of blood clots.

25.     Heparin is used to treat and prevent blood clots caused by certain medical conditions or medical procedures.

26.     Relator asked the technician responsible for Heparin why they had not been filled and was told that Delia Tarcea ("Delia") had instructed the technician to use saline solution instead of Heparin.

27.     Delia was a technician who spent most of her time at the DaVita dialysis clinic located in West Bloomfield, Michigan, over which Farr is also the FA.

28.     Delia filled in periodically at the Commerce Township clinic.  Delia had worked for DaVita for many years.

29.     Delia left for vacation on December 11, 2017.  Relator reviewed the Commerce Township clinic's Heparin log and discovered that Heparin usage noticeably increased while Delia was gone.

30.     On December 29, 2017, Relator met with Farr and informed Farr that she had discovered that Delia had been administering saline solution instead of Heparin, but logging Heparin as having been given, and may have been doing so for quite some time.

31.     To Relator's dismay, Farr reacted to the news with hostility towards Relator.  Farr threatened to fire Relator with comments such as, "Maybe your job is too stressful, should I get a new nurse?" and, "I think something is wrong with you and maybe I should replace you."  Farr did not appear to be at all surprised or concerned about what was being reported.

32.     On Sunday, December 31, 2017, Relator and another employee called the DaVita compliance hotline to report the problem.  Relator was told that they would get back to her.

33.     The following Wednesday, January 3, 2018, having heard nothing from compliance, Relator sent an email to Alex Delgado ("Delgado"), her Regional Director, asking for his assistance and stating "Of great concern to me recently is likely documentation fraud regarding heparin administration which could affect my nursing license."  Relator asked to meet with Delgado to discuss the situation.

34.     On that same day, Relator discussed the situation with Dr. Margolis, the Commerce Township clinic's Medical Director.

35.     On January 8, 2018, Delia showed up to work at the Commerce Township clinic. Relator immediately texted her objection to Farr, but Farr informed Relator that she had no problem with Delia returning to work at the clinic and that she hadn't had time to speak with her about the Heparin issue.

36.     Consequently, Relator confronted Delia at the clinic.  Delia admitted to Relator that she had not been administering Heparin per doctors' orders, and callously stated, "Nobody

clotted off, did they?"  The clinic's Heparin log shows that Heparin usage dropped significantly once Delia returned to work.

37.     Delia assisted at minimum, ten (10) patients per week, three (3) times a week.

38.     On January 9, 2018, Relator received an email response from Delgado stating, "I have spoken with Georgia and I am confident in saying that her comments came from a good place and were with your best interests and happiness in mind."  Delgado ignored the Heparin issue and expressed no surprise or concern whatsoever.

39.     The following day, Wednesday, January 10, 2018, Brenda Hunt ("Hunt"), the Regional Facility Administrator for the Commerce Township clinic, showed up at the clinic to meet with Farr and Relator.

40.     Farr denied what she had said to Relator.  Farr stated that the case was closed because she had spoken with Delia and Delia had denied the alleged fraud.  Hunt showed no surprise or concern regarding the fraud allegation and was instead overtly hostile towards Relator, suggesting that Farr should write her up for insubordination because she interrupted Farr during their meeting.

41.     Hunt then threatened to transfer Relator to a different clinic far from her home and asked Farr in Relator's presence if she could find coverage for Relator at the Commerce Township clinic.  On that that same day, Relator's job was posted online.

42.     Upon information and belief, Defendants were aware of Delia's practices and determined to get rid of Relator rather than discontinue such practices.

43.     Upon information and belief, such practices are widespread throughout Defendant's clinics.

8

44.     On January 11, 2018, having received no response from the compliance hotline, Relator left a message on the People Services zero tolerance hotline regarding the activity she had reported and the retaliation she was suffering.

45.     The next morning, Friday, January 12, 2018, Hunt called Relator and instructed her to follow Farr's directions.   It was clear to Relator that Mr. Delgado and Hunt were protecting Farr and Delia, and had no interest in discontinuing the fraudulent billing practice.

46.     That afternoon, Relator received a call from Donna Becker ("Becker"), the Head Compliance Officer at DaVita.  Becker was the first person who showed any concern over the alleged fraud.  Becker interviewed Relator and one of the techs and requested Heparin logs which were faxed to her.

47.     The following Friday, January 19, 2018, Farr informed Relator that there would be a follow-up telephone conference with Becker that afternoon.  During the conversation, Relator learned that Farr had spent Saturday, January 13, 2018 at the clinic putting together a report in an attempt to discredit the Heparin log Relator had provided to Becker.

48.     Relator also learned that on January 13th, an anonymous telephone call was made to the DaVita compliance hotline accusing Relator of having falsely charted medication as having been given, included a photograph of Epogen in a refrigerator at the Commerce Township clinic.

49.     Upon information and belief, Farr made the false accusations against Relator with the knowledge and approval of her superiors.

50.     Becker characterized the Heparin report Farr put together as being unsubstantiated and of no use, and described the anonymous compliance hotline accusation against Relator as "fishy."

51.     On January 22, 2018, Relator was informed by Becker that the claim that Delia had been failing to administer Heparin had been substantiated.  Delia's employment with DaVita was thereafter terminated, but no disciplinary action has been taken against anyone else.

52.     On Tuesday, January 23, 2018, due to Defendants' hostility and retaliation described above, Relator submitted her resignation, effective February 9, 2018.

53.     Relator did so because she had every reason to believe Defendants would continue the hostility and retaliation given DaVita's failure to enforce its own policies, including Policy# Comp – USA – 007 entitled "Non-Retaliation for Reporting Potential Compliance Violations"; Policy# Comp – KC – 009 entitled "False Claims Act and Detecting Fraud and Abuse"; Policy# COMP – DD – 013 entitled "Government Investigations and Reportable Events Requirements."

54.     Relator gave two (2) weeks' notice to preserve her right to the paid time off she had accumulated.  However, on February 9, 2018, Relator was given a letter from Farr stating, "This letter is to notify you that your employment with DaVita is being terminated effective 2/10/2018."

55.     Farr was attempting to deny Relator the paid time off which she was entitled.

56.     Relator is severely distressed as a result of the abusive retaliation inflicted upon her for having complied with DaVita's purported policies.

57.     Relator has obtained employment since her resignation, but has only been able to find employment paying significantly less than what she was paid while working with DaVita.

## COUNT I

## DEFENDANTS FALSELY BILLED THE GOVERNMENT FOR HEPARIN

58.     Plaintiff repeats and realleges Paragraphs 1 through 57 above.

59.     The Heparin scheme involved the following: Despite doctors' orders to administer Heparin to dialysis patients, Delia administered saline solution instead, but charted patient records and logs as having administered Heparin, which in turn was billed to Medicare and/or Medicaid.

60.     Defendants were reimbursed a higher amount for administering Heparin when in reality they were administering saline solution, at a much cheaper cost.

61.     Defendants had actual knowledge of the fraudulent overbilling, or acted with deliberate ignorance or reckless disregard of the truth.

62.     The actions of Defendants in the preceding paragraphs caused damage to Medicare and other Government payors and continues to do so.

63.     The United States Government, unaware of the falsity of the claims and/or statements made or caused to be made by the Defendants, and in reliance on the accuracy of the claims and/or statements, paid for Heparin not provided to individual patients insured by federally-funded health insurance programs, including Medicare.  Had the United States known that the bills caused to be presented by Defendants for payment were false and misleading, payment would not have been made for such claims.

**WHEREFORE,** Plaintiff/Relator, acting on behalf of and in the name of the United States of America, demands and prays that judgment be entered in favor of the United States against each Defendant, jointly and severally, as follows:

A.      For treble the amount of the United States' damages, plus civil penalties of Eleven Thousand Five Hundred Dollars ($11,500) for each false claim referenced above;

B.      For all costs of this civil action;

C.     That Plaintiff be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d);

D.     That a trial by jury be had as to the allegations against each Defendant set forth herein;

E.     That the Plaintiff and the United States receive such other and further relief as this Court deems to be just and equitable.

## COUNT II

## DEFENDANTS OVERCHARGED THE GOVERNMENT FOR SALINE SOLUTION

64.     Plaintiff repeats and realleges Paragraphs 1 through 63 above.

65.     The saline solution scheme involved the following: Despite doctors' orders to administer Heparin to dialysis patients, Delia administered saline solution instead, but charted patient records and logs as having administered Heparin, which in turn was billed to Medicare and/or Medicaid.

66.     DaVita was reimbursed the higher amount for Heparin and therefore, overcharged the Government for administering saline solution.

67.     The actions of Defendants in the preceding paragraphs caused damage to Medicare and other Government payors and continues to do so.

68.     The United States Government, unaware of the falsity of the claims and/or statements made or caused to be made by the Defendants, and in reliance on the accuracy of the claims and/or statements, overpaid for saline solution provided to individual patients insured by federally-funded health insurance programs, including Medicare.  Had the United States known that the bills caused to be presented by Defendants for payment were false and misleading, payment would not have been made for such claims.

**WHEREFORE,** Plaintiff/Relator, acting on behalf of and in the name of the United States of America, demands and prays that judgment be entered in favor of the United States against each Defendant, jointly and severally, as follows:

A.      For treble the amount of the United States' damages, plus civil penalties of Eleven Thousand Five Hundred Dollars ($11,500) for each false claim referenced above;

B.      For all costs of this civil action;

C.      That Plaintiff be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d);

D.      That a trial by jury be had as to the allegations against each Defendant set forth herein;

E.      That the Plaintiff and the United States receive such other and further relief as this Court deems to be just and equitable.

## COUNT III

## DEFENDANTS ENGAGED IN RETALIATORY HARASSMENT AGAINST PLAINTIFF

69.      Plaintiff repeats and realleges Paragraphs 1 through 68 above.

70.      Plaintiff was engaged in a protected activity when she reported the misuse of saline to her superiors.

71.      Defendants were well aware that Plaintiff's actions were a protected activity as evidenced by their own internal policy, Policy# Comp – USA – 007 entitled "Non-Retaliation for Reporting Potential Compliance Violations"

72.      Despite Plaintiff's protected activity, Defendants subjected Plaintiff to severe and pervasive retaliatory harassment, including, but not limited to, threats of termination and false accusations of improper drug administration.

13

73.     Defendants' actions were so severe and pervasive that Plaintiff was forced to resign and was, therefore, constructively discharged.

**WHEREFORE,** Plaintiff demands and prays that judgment be entered in favor of Plaintiff in an amount and other and further relief as this Court deems to be just and equitable.


Respectfully submitted,

McKelvie, McKelvie, Yee & Epacs, P.C.


By:     */s/ Edmund S. Yee*
          Charles L. McKelvie (P27782)
          Edmund S. Yee  (P63007)
          Attorneys for Plaintiff/Relator
          280 West Maple Road, Suite 220
          Birmingham, Michigan  48009
Dated: February 2, 2021          (248) 952-5100


O:\N\Niehaus, Sue/Complaint.docx